**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

CARLOS E. CÁRDENAS,

        Plaintiff,

    v.

OFFICER T. TUBBS, *et al.*,

        Defendants.

No. 11-cv-1685-EGS

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carlos E. Cárdenas hereby opposes defendants' Motion for Summary Judgment ("MSJ"), ECF No. 23.

This is a straightforward case in which a citizen was treated roughly by a Metro Transit Police officer, and then falsely arrested when he orally protested too long and too loudly for the officer's taste. Defendants' motion for summary judgment rests not on any undisputed material facts, but on their own, often self-contradictory, version of events. The motion should be denied for the reasons set forth below.

### FACTS

Plaintiff Carlos E. Cárdenas teaches mathematics to 6th and 7th graders at a D.C. charter school. Deposition of Carlos E. Cárdenas ("Cárdenas Dep.") at 6. At the time of his arrest, he was a soccer coach. *Id*. at 7. Before this incident, he had never been arrested. *Id*. at 67. His girlfriend, Maria de Jesus Avellaneda, is a background investigator at the U.S. Office of Personnel Management. Deposition of Maria de Jesus Avellaneda ("Avellaneda Dep.") at 8. Their deposition testimony, which must be credited at this stage, recounts the events of September 18, 2010, as follows.

After having an alcohol-free dinner with some friends at the Fuddruckers restaurant at 7th and H Streets, N.W., they entered the Metrorail system at the Gallery Place station on their way home, at about 8 p.m.  Cárdenas Dep. at 8, 12; Avellaneda Dep. at 8-12.  As they descended the second set of escalators, Mr. Cárdenas stood in front, toward the right, holding Ms. Avellaneda's bicycle with his right hand, in front of him and to his right.  Cárdenas Dep. at 16.  Ms. Avellaneda stood behind him.  *Id.*; Avellaneda Dep. at 18.  *There was room for a person to get by Mr. Cárdenas on his left.* Cárdenas Dep. at 17.

Suddenly, they heard someone behind them yelling "to the effect of, 'Move, move, get out of the way, move,'" Cárdenas Dep. at 18, *accord* Avellaneda Dep. at 19-20.  They saw that it was a police officer, Avellaneda Dep. at 19, who was later identified as defendant Tubbs, Cárdenas Dep. at 17-18; Avellaneda Dep. at 19.  Officer Tubbs put his hand on Mr. Cárdenas' back and said "something to the effect, 'If you're here with a bike, you're going to walk down with this bike.'"  Cárdenas Dep. at 18.  Mr. Cárdenas then "attempted to walk down" with the bike, Cárdenas Dep. at 19; Avellaneda Dep. at 20 ("I remember Carlos trying to move the bike down the escalator and I'm following behind.").  But the bike slipped out of his hands and fell to the bottom of the escalator.  Cárdenas Dep. at 19; Avellaneda Dep. at 21.[1]

Now at the mezzanine level, Mr. Cárdenas approached Officer Tubbs to ask "Why he had yelled and why he had put his hand on me."  Cárdenas Dep. at 21.  After

---

[1]  Officer Tubbs testified that he said to Mr. Cárdenas, "Pick up the front, I'll grab the back, and we'll go down the steps. And the bike fell."  Deposition of Timothy Tubbs ("Tubbs Dep.") at 46.  It is entirely consistent with that testimony that Officer Tubbs picked up and pushed the bicycle more quickly than Mr. Cárdenas could move, pushing it out of Mr. Cárdenas' hands and causing it to fall down the escalator.  On defendants' motion for summary judgment, plaintiff is entitled to that reasonable inference.

first "tilting his head away," *id*. at 21, Officer Tubbs said, "Watch this," and "did something with [his] walkie-talkie." *Id*. at 22-23. "Within a few seconds there are police officers going up to Officer Tubbs saying, 'Where is he? Where is he? Where is he?'" *Id*. at 23. The officers then faced Mr. Cárdenas; one of them shoved Mr. Cárdenas in the chest, and then "all these officers turned me around, and they piled on top of me. And the motion, of course, was, as they're piling up on me, I'm crashing against the floor," and "as I'm landing on the floor, my hands are also being taken . . . in my back." *Id*. at 23-24. Ms. Avellaneda, who had moved her bicycle near the fare-card machines to "get it out of the way," Avellaneda Dep. at 26, "turned around and saw Carlos on the floor" with "a whole bunch of officers on top of him." *Id*. at 26-27.

Mr. Cárdenas was handcuffed, arrested, and held overnight. Cárdenas Dep. at 45-51. The following morning he was being driven to the hospital for some medication, but on the way he learned from the MPD officer driving him that he could post and forfeit collateral and be released; he asked the driver to return to the police station so he could do that. *Id*. at 71-74. The driver telephoned Ms. Avellaneda to bring $35 to the station, which she did, and Mr. Cárdenas was released at 10 or 11 a.m. *Id*. at 76-77; Avellaneda Dep. at 47-48.

This lawsuit followed.

## ARGUMENT

Summary judgment is not appropriate unless the moving party can demonstrate that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56; *Miller v. Hersman*, 594 F.3d 8, 12 (D.C. Cir. 2010). In considering a motion for summary judgment, a court must

view the evidence in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences.  *Chambers v. U.S. Dep't. of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

### I. Defendants' motion should be denied because defendants have failed to comply with Local Civil Rule 7(h).

Local Civil Rule 7(h)(1) provides that "Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue."  As the courts of this district have often reminded litigants, a proper statement of material facts

> directs the district judge and the opponent of summary judgment to the parts of the record which the movant believes support his statement. The opponent then has the opportunity to respond by filing a counter-statement and affidavits showing genuine factual issues. The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record. These purposes clearly are not served when one party, particularly the moving party, fails in his statement to specify the material facts upon which he relies . . . .

*Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980).

While defendants have filed a document labeled "Statement of Material Facts," ECF No. 23-1, it utterly fails to serve these purposes.  It consists of eleven short sentences reciting such undisputed facts as the date of the incident, the fact that plaintiff was arrested, and the fact that he was released after posting and forfeiting collateral.  But it contains no facts even purporting to support defendants' contentions that they had probable cause to arrest plaintiff, or that the force they used against plaintiff was reasonable, or that defendant Brown had no part in plaintiff's arrest — defendant Brown is not even mentioned.  This does not satisfy defendants' obligations under the local rule.

As this Court has explained, it "is under no obligation to sift through the record in order to evaluate the merits of a party's case.  Rather, consistent with Rule 7(h), a court determining whether to grant summary judgment may rely on the parties' separate statements of material facts and the record material they reference."  *Diggs v. Potter*, 700 F. Supp. 2d 20, 25 n.1 (D.D.C. 2010) (Sullivan, J.) (internal quotation marks, citations, and alterations omitted).  Because defendants' statement of material facts fails to identify material facts sufficient to support any part of their motion, defendants' motion for summary judgment can and should be dismissed without further ado.

## II. The Court should deny summary judgment as to Count I (violation of Fourth Amendment rights) because undisputed facts do not demonstrate that defendants are entitled to judgment as a matter of law.

Defendants argue (1) that undisputed facts demonstrate that defendants had probable cause to arrest plaintiff for impeding the escalator, (2) that undisputed facts demonstrate that defendants had probable cause to arrest plaintiff for disorderly conduct, (3) that even if they lacked probable cause to arrest plaintiff they are protected by qualified immunity, (4) that undisputed facts demonstrate that any force used was reasonable, and (5) that plaintiff's decision to post and forfeit collateral requires dismissal of his claim.  We show below that each of these arguments lacks merit.

### A. There is no set of undisputed facts showing that defendants had probable cause to arrest plaintiff for impeding the escalator.

D.C. Code § 35-251(d) provides that "It is unlawful for any person at a rail transit station to stop, impede, interfere with, or tamper with an escalator or elevator . . . ."  Defendants seek summary judgment on the ground that they had probable cause "to believe that Plaintiff had impeded the escalator" during the events described above.  MSJ at 14.  But, crediting plaintiff's testimony, the facts do not support that conclusion.  Mr. Cárdenas was simply standing on the escalator, to the right, holding his girlfriend's

bicycle, and *leaving room for a person to get by him on his left.* Cárdenas Dep. at 17.

When Officer Tubbs shouted at him to "walk down," he "attempted to walk down" with

the bicycle.   Cárdenas Dep. at 18-19; Avellaneda Dep. at 20.  The bicycle, not

surprisingly, slipped and fell, Cárdenas Dep. at 19; Avellaneda Dep. at 21, or perhaps

was pushed by Officer Tubbs, *see supra* n.1.  Moreover, Officer Tubbs testified that

when he confronted Mr. Cárdenas and Ms. Avellaneda, they were already "approximately

halfway down — I don't know — two-thirds of the way down the escalator."  Tubbs

Dep. at 14.  The escalator in question is a short one; the trip from top to bottom takes

only 32 seconds, standing still.  *See* Declaration of Elizabeth Marie Palumbo, filed

herewith.[2]  Thus, any delay of Officer Tubbs' descent down the remaining half or one-

third of the escalator would have been a matter of at most 11 to 16 seconds.  These facts

do not even suggest that plaintiff committed the crime of "impeding the escalator."

Large-sized people use the Metro system every day.  Does WMATA really

believe that all of them are criminals because their girth might "impede" others from

passing them on an escalator?  Apparently the incumbent governor of New Jersey would

be well advised not to use Metro when he visits the nation's capital, as under WMATA's

interpretation of D.C. Code § 35-251(d) he would be a *per se* impediment and subject to

arrest at any Metro station.

Metro passengers also carry large suitcases — sometimes more than one — on

their way to and from National Airport and Union Station.  Are they lawbreakers, too, if

their luggage prevents others from running past them on the escalator?  If two elderly

---

[2]  The witnesses agree that the escalator in question is the second one that a passenger
would use in going from the street level at the 7th and H Street entrance to the mezzanine
level.  Cárdenas Dep. at 13-14; Avellaneda Dep. at 14-15; Tubbs Dep. at 13.

tourists had been standing side by side on the escalator at Gallery Place when Officer

Tubbs came charging down, and one could not quickly leap in front of or behind the

other and to the right, would they also have been subject to arrest?  It cannot be the law

that Mr. Cárdenas' inability immediately to make himself two-dimensional constituted a

criminal offense.[3]  In any event, the Court must credit plaintiff's testimony that there was

room for a person to get by him on his left, and that fact negates any claim that there was

probable cause to believe he was impeding the escalator.

Independently, the record in this case makes it impossible for the defendants to

show that the arresting officer or officers had probable cause to believe that Mr. Cárdenas

impeded the escalator.  D.C. Code § 23-581(a)(1)(B) provides that a law enforcement

officer may make a misdemeanor arrest without a warrant of a person whom the officer

"has probable cause to believe has committed or is committing an offense in his

presence."  Officers may only make such an arrest based on probable cause generated

using their own firsthand knowledge or in response to a request from a superior or

associate who has knowledge giving rise to probable cause to make an arrest.  *Williams v.*

*United States*, 308 F. 2d 326, 327 (D.C. Cir. 1962).  Hence, "the answer to the question

of probable cause," in the absence of a fellow officer's valid request to make an arrest,

"must be found in the evidence of which [the arresting officer] was aware at the time of

the arrest."  *Gatlin v. United States*, 326 F. 2d 666, 668 (D.C. Cir. 1963).  *See also Beck*

*v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether that arrest was constitutionally valid depends

in turn upon whether, at the moment the arrest was made, the officers had probable cause

---

[3]  Defendants cite a provision of a WMATA tariff providing that when traveling with a
bicycle, "patrons must observe the following conventions . . . Use the elevators to access
mezzanines and platforms."  MSJ at 15, citing WMATA Tariff No. 29, § 16.  But
defendants do not claim that failing to "observe" this "convention" is a crime.

to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.").

Although the specific role played by each officer in plaintiff's arrest is unclear, defendants' own testimony indicates that the officer or officers who arrested plaintiff had no knowledge of any impediment arguably caused by plaintiff on the escalator. Officer Tubbs testified that he was not near plaintiff during plaintiff's arrest, did not witness or take part in the arrest, and was not even aware of plaintiff's arrest until plaintiff had already been transported out of the Metro station to street level. Tubbs Dep. at 22-36.[4] Officer Santiago's testimony supports this version of events. Deposition of Francisco Santiago ("Santiago Dep.") at 35 ("At the time of Cardenas being placed in handcuffs, I don't recall Officer Tubbs being in the area."). Defendants point to no evidence showing that Officer Tubbs, prior to the arrest, had communicated to any officer who actually made the arrest his knowledge of plaintiff's alleged escalator infraction. In fact, defendant Charneco, the officer who handcuffed plaintiff, *see* Deposition of John P. Charneco ("Charneco Dep.") at 13, specifically disclaimed any knowledge of the interaction between plaintiff and defendant Tubbs on the escalator. *Id*. at 33.

Underscoring the disputed nature of the facts in this case, there is conflicting testimony as to whether defendant Tubbs initiated plaintiff's arrest. Contrary to the testimony of defendants Tubbs and Santiago, defendant Charneco testified that Officer

---

[4] For example, when Officer Tubbs was asked, "Did you see Mr. Cardenas placed under arrest?," he responded, "No, sir."  Tubbs Dep. at 29.

Tubbs told plaintiff that he was under arrest and then Charneco and the other defendants responded by taking plaintiff into custody.  Charneco Dep. at 9-12.

Thus, even if the Court were to credit defendants' testimony, there is no undisputed evidence that plaintiff was arrested for impeding the escalator by any officer who had probable cause to believe plaintiff had committed that offense.  Which defendant(s) actually arrested plaintiff, and the extent of their knowledge at the time of the arrest, are material issues of fact and are clearly disputed, even among the defendants. Summary judgment is therefore improper as to this issue.

### B.  There is no set of undisputed facts showing that defendants had probable cause to arrest plaintiff for disorderly conduct.

Defendants next argue that they had probable cause to arrest plaintiff for disorderly conduct in violation of D.C. Code § 22-1321.[5]  Defendants' entire argument on this point consists of a single sentence:  "Similarly, there was ample factual support, again taking the facts in the light most favorable to Plaintiff, for a reasonable police officer to believe that Plaintiff had engaged in disorderly conduct."  MSJ at 14.  Neither

---

[5] At the time of plaintiff's arrest, the disorderly conduct statute provided:

> Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; (2) congregates with others on a public street and refuses to move on when ordered by the police; (3) shouts or makes a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons; (4) interferes with any person in any place by jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag; or (5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows or upon the seats, or otherwise annoying passengers or employees, shall be fined not more than $250 or imprisoned not more than 90 days, or both.

As defendants note, MSJ at 14, this statute was amended after plaintiff's arrest.  Plaintiff agrees that the relevant statute is the one that was in effect at the time of his arrest.

defendants' motion nor their statement of undisputed material facts specifies which allegedly undisputed facts they rely upon for this conclusion; no attempt is made to apply the relevant disorderly conduct law to the facts of this case.  Defendants do not even tell the Court under which subsection of the statute they claim to have had probable cause. *See id*.  This portion of their motion should therefore be denied as inadequate on its face.

If defendants were asked under which subsection of the statute they claim to have had probable cause, they would presumably point to subsection (1) ("annoy, disturb, interfere with, obstruct, or be offensive to others . . . with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby"), as the other subsections are not remotely relevant.  But defendants point to no conduct of plaintiff that even probably satisfied these criteria.  Again, defendants' own testimony provides evidence negating probable cause.  Defendant Charneco did not recall any crowd gathering.  Charneco Dep. at 40.  Defendant Brown testified that "people would stop and look, but they would still proceed on their way."  Deposition of Dwayne Brown ("Brown Dep.") at 12.  And defendant Santiago testified that he recalled some people "rubbernecking," but could not estimate how many people there were or anything else they may have been doing.  Santiago Dep. at 60.

There is evidence that after his girlfriend's bicycle fell down the escalator, plaintiff was "extremely upset" and asked Officer Tubbs, "what the f*** [*sic*] is your problem," Tubbs. Dep. at 14, and that before his arrest plaintiff was "standing in front of Officer Tubbs . . . yelling and waving his hands."  Santiago Dep. at 17.[6]  Even crediting that evidence, it provides no probable cause for an arrest, as the D.C. Court of Appeals made clear in many cases applying the disorderly conduct statute that was in effect at the time of plaintiff's arrest.

---

[6]  Officer Brown testified that what plaintiff was yelling was "This is police brutality, this is police brutality."  Brown Dep. at 7.  Officer Santiago testified that plaintiff "was demanding an apology from Officer Tubbs for — I'm not sure what exactly happened as he was entering the station."  Santiago Dep. at 17.

For example, in *In re W.H.L.*, 743 A.2d 1226 (D.C. 2000), the arresting officer and others had responded to a call about a shooting.  They lined up some potential suspects against a wall and began identifying and questioning them.  As this was happening, W.H.L. rode his bicycle up to the scene and, while riding back and forth near the officers, repeatedly taunted them in a "loud voice," saying "ya'll petty as shit; fuck ya'll."  He also ignored officers' repeated directions to move on.  W.H.L. then went into a nearby shop.  When he emerged, the arresting officer approached him and asked if his bicycle was registered.  W.H.L. responded that it was not.  As the officer and W.H.L. then struggled over the bike a crowd of onlookers gathered, and W.H.L. began cursing at the officer again.  *Id.* at 1227-28.  The court held that W.H.L. had not engaged in disorderly conduct because "W.H.L.'s words were not aimed at the crowd, but at the officer herself.  W.H.L. was not attempting to entice the crowd to act against the police, but in reaction" to the officer's behavior.  *Id.* at 1229.  It follows *a fortiori* that there was no disorderly conduct here, where the evidence showed only an upset citizen confronting an officer who had pushed him on an escalator, and no crowd gathering at all.  *See also Shepherd v. District of Columbia*, 929 A.2d 417 (D.C. 2007) (when Metro Transit Police officer issued defendant a citation for fare evasion, defendant became agitated and begun cursing at officer, yelling, and calling officer racist.  Defendant ignored warnings to be quiet and spectators gathered.  *Id.* at 418.  Held: no disorderly conduct because defendant neither intended to cause a breach of the peace nor were his actions likely to provoke violence by others.  *Id.* at 419.); *Rezvan v. District of Columbia*, 582 A.2d 937 (D.C. 1990) (no disorderly conduct where defendant followed officer to his cruiser and screamed at officer for more than five minutes); *Martinez v. District of Columbia*, 987 A.2d 1199 (D.C. 2010) (no disorderly conduct where defendant berated officers with myriad imaginative vulgarities while bystanders observed).

Defendants' motion for summary judgment should therefore be denied on this issue.

### C. Defendants are not entitled to qualified immunity on plaintiff's unconstitutional arrest claims.

Qualified immunity protects government officials from liability in civil actions only to the extent that "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Elkins v. District of Columbia*, 690 F. 3d 554, 567 (D.C. Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Under this standard, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (alterations in original)).

Even when a motion for summary judgment includes a claim of qualified immunity, the Court must assume the non-moving plaintiff's evidence is true.  *See Johnson v. Jones*, 515 U.S. 304, 319 (1995) (noting that on appeal of a denial of qualified immunity, an appellate court, like the trial court, must view the facts "in the light most favorable to the nonmoving party"); *accord Barham v. Ramsey*, 434 F.3d 565, 577 (D.C. Cir. 2006) (noting that "[t]he record assembled for summary judgment" did not "permit a definitive resolution of [a] factual question" essential to Chief Ramsey's claim of qualified immunity).  Accepting plaintiff's evidence, no reasonable police officer could have believed that arresting Mr. Cárdenas for impeding the escalator or disorderly conduct was lawful.

It is not necessary to repeat the facts at length.  Mr. Cárdenas testified that as he was standing on the escalator, there was room for a person to pass him on his left. Cárdenas Dep. at 17.  Officer Tubbs has not even suggested that Mr. Cárdenas affirmatively acted in some way to block his passage.  No reasonable police officer could have believed that Mr. Cárdenas had committed the crime of impeding the escalator.

Mr. Cárdenas testified that on the mezzanine, when he asked Officer Tubbs for an explanation of his conduct, Officer Tubbs summoned other officers, who pushed plaintiff

to the floor, jumped on him, and handcuffed him behind his back.  *Id*. at 21-24.  Even the officers did not testify to any threats, any sudden movements, any resistance, or any hostile crowds gathering.  No reasonable police officer could have believed that Mr. Cárdenas had committed the crime of disorderly conduct.

 The right to be free from arrest in the absence of probable cause has long been clearly established.  *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'") (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration in original); *Martin v. Malhoyt*, 830 F. 2d 237, 262 (D.C. Cir. 1987) ("It is well settled that an arrest without probable cause violates the fourth amendment.").  The D.C. Court of Appeals cases cited earlier (*supra* at 11-12) make it more than clear that plaintiff's conduct could not warrant a prudent police officer in believing that Mr. Cárdenas had committed or was committing the offense of disorderly conduct.

While the standards for qualified immunity have changed since 1977, it remains true that "an arrest may not be 'justified by ignorance or disregard of settled, indisputable law.'"  *Dellums v. Powell*, 566 F. 2d 167, 176 (D.C. Cir. 1977) (quoting *Wood v. Strickland*, 420 U.S. 308, 321 (1975)).  Defendants' claim of qualified immunity asks the Court to excuse their ignorance or disregard of settled, indisputable law.  That claim should be denied.

### D.  There is no set of undisputed facts showing that defendants did not use excessive force against plaintiff.

Defendants next claim that undisputed facts show that the force used against plaintiff was not excessive.  Their argument on this point is nearly as brief as their argument about disorderly conduct.  They point out that "[p]laintiff's claim of injury is limited to scrapes of his knuckles and minor bruises to his upper arms," and that he

"sought no medical treatment" for these injuries.  MSJ at 15.  They then cite several cases in which more significant injuries were held not to have involved excessive force under the circumstances of those cases.  MSJ at 15-16.  Defendants' argument proves nothing, as the circumstances of those cases, in which the use of force was justified, were entirely different from the circumstances of this case, in which it was not.[7]

Police officers employ excessive force when their actions are objectively unreasonable "in light of the facts and circumstances confronting them."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  It follows that when there is no need for any use of force, any use of force is unreasonable.  *See, e.g., Lolli v. County of Orange*, 351 F. 3d 410, 417 (9th Cir. 2003) ("Where there is no need for force, *any* force used is constitutionally unreasonable.") (Internal quotation marks and alteration omitted; emphasis in original); *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998) ("There is no evidence in the record to suggest that plaintiff posed a danger to the officer or others.

---

[7]  Defendants rely on three cases.  In all three, a custodial arrest was properly based on probable cause, justifying a reasonable use of force.  In *Rogala v. District of Columbia*, 161 F.3d 44 (D.C. Cir. 1998), the court found it reasonable for an officer to reach into a car and pull one arrestee out by her arm after she had refused to exit the vehicle, and to throw to the ground a second arrestee who had grabbed the officer from behind in a manner "reasonably perceived . . . as threatening."  *Id*. at 54.  In *Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996), the court found it reasonable for officers to "knock[] [plaintiff] to the ground, roll[] him over, and pin[] him with their knees so that he could be handcuffed," when his behavior was "erratic" and he had already escaped from custody once.  *Id*. at 759.  Finally, in *Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987), the court found it reasonable for police to push a driver back into his vehicle and slam the door, hitting his leg, and later to push him against the vehicle and handcuff him behind his back.  The court explained that "[b]y opening his door into traffic Mr. Martin caused a traffic hazard which was a danger to himself and the oncoming traffic, and that "the door slamming, given the apparent need for instant action, does not appear to be an extraordinary response."  *Id*. at 262.  That these uses of force were found reasonable under the circumstances presented by these cases tells us nothing about whether force was reasonable in Mr. Cárdenas' case, where there was no probable cause for an arrest and no threat, or flight, or resistance of any kind.

Accordingly, because of the absence of any justification for Webster's use of force, application of the Fourth Amendment reasonableness standard 'would inevitably lead every reasonable officer . . . to conclude that the force was unlawful.'") (alteration in original; citation omitted); *Agee v. Hickman*, 490 F.2d 210, 212 (8th Cir. 1974) ("This Court does not mean to condone, by this opinion, the use of any force by officers simply because a suspect is argumentative, contentious or vituperative.  It is the policeman's lot to take such verbal abuse without retaliation by force.  Force can only be used to overcome physical resistance or threatened force . . . .").

The facts here are parallel.  Crediting plaintiff's evidence, defendants *without provocation* threw plaintiff face first to the concrete floor of the Metro station.  They also piled upon him, pulled his hands behind his back, handcuffed him, and caused the thankfully minor injuries he suffered.  There is no evidence in the record to support an inference that if plaintiff had been told he was under arrest *before* being thrown to the floor, he would not have peacefully allowed himself to be taken into custody.  The contrary inference is required in favor of the non-moving party.  Crediting not only plaintiff's version of the facts but also defendants', no force was justified here, and anyuse of force was therefore objectively unreasonable.[8]

---

[8] Under *Graham v. Connor,* courts evaluating police uses of force consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  Even assuming, *arguendo*, that defendants had probable cause to arrest plaintiff here, they still used force that was plainly unreasonable under the circumstances.  Plaintiff's alleged crimes were minor misdemeanors, and defendants offer no evidence that plaintiff posed any threat to the safety of the officers or others, or that he resisted arrest or sought to flee.  Indeed, plaintiff was never told he was under arrest until after he was thrown to the floor, *see* Cárdenas Dep. at 24, so he had nothing to resist or to flee from.

Defendants point to the relatively minor nature of plaintiff's injuries as negating the possibility of excessive force.  MSJ at 15.  But while the extent of plaintiff's injuries is relevant to the quantum of his damages, the use of excessive force by police officers is a Fourth Amendment violation compensable by at least nominal damages even in the absence of any physical injury.  *See, e.g., Atkins v. New York City*, 143 F. 3d 100, 103 (2d Cir. 1998); c*f. Wilkins v. Gaddy*, 130 S. Ct. 1175, 1176 (2010) (in the prison context, courts are "to decide excessive force claims based on the nature of the force rather than the extent of the injury").

Because defendants have not presented undisputed facts justifying their use of force, summary judgment on this claim should also be denied.[9]

### E.  Plaintiff's decision to post and forfeit collateral does not bar his constitutional claims.

Without any citation of authority, defendants also argue that plaintiff's decision to obtain release from custody by posting and forfeiting collateral bars his constitutional claims on the ground that a "requisite element of a civil claim for an alleged unconstitutional or false arrest is that the criminal proceeding be terminated in the plaintiff's favor.  Posting or forfeiting collateral by its nature prevents a plaintiff from establishing this essential element."  MSJ at 15.

Defendants' statement of the relevant legal standard is incorrect.  Defendants' statement about the "nature" of a post and forfeit is also incorrect.  Defendants' conclusion is therefore incorrect.

First, the relevant law is the Supreme Court's ruling in *Heck v. Humphrey*, 512 U.S. 477 (1994), that:

---

[9]  Defendants have not claimed qualified immunity as to the excessive force claim.  *See* MSJ 15-16.  That is proper, because "the issues of whether an officer used excessive force and whether an officer is entitled to qualified immunity are determined according to a single standard."  *Scott v. District of Columbia*, 101 F.3d 748, 759 (D.C. Cir. 1996).

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Id*. at 486-87 (emphasis in original).  Thus, where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," a court must dismiss a § 1983 claim "unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Id*. at 487.

Second, the legal effect of a post and forfeit is authoritatively described in the D.C. Code:

> The resolution of a criminal charge using the post-and-forfeit procedure *is not a conviction of a crime and shall not be equated to a criminal conviction.* The fact that a person resolved a charge using the post-and-forfeit procedure may not be relied upon by any court of the District of Columbia or any agency of the District of Columbia in any subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability.

D.C. Code § 5-335.01(b) (emphasis added).[10]

It is therefore obvious that defendants' argument has no merit.  Because a post and forfeit "is not a conviction of a crime and shall not be equated to a criminal conviction," plaintiff was never convicted, and thus his lawsuit cannot possibly "imply the invalidity of his conviction or sentence."  The *Heck* bar has no application here.

---

[10]  D.C. Code § 5-335.01 provided a legislative *imprimatur* to the longstanding but previously uncodified post-and-forfeit procedure.  It was enacted in 2005 as an outgrowth of the ACLU's settlement of some of the 2002 Pershing Park arrests, in which hundreds of people were falsely arrested, posted and forfeited collateral, and filed damages actions under § 1983 that were subsequently settled for large sums.  *See Abbate v. Ramsey*, 355 F. Supp. 2d 377, 385 (D.D.C. 2005) (Sullivan J.) (approving settlement agreement incorporating provisions similar to those later codified at D.C. Code § 5-335.01).

### III. The Court should deny summary judgment on plaintiff's common law claims because undisputed facts do not demonstrate that defendants are entitled to judgment as a matter of law.

Plaintiff's complaint asserts claims of false arrest and assault and battery under the common law of the District of Columbia.  Defendants also seek summary judgment on those claims, but their motion has no better support regarding those claims than it does for plaintiff's federal claims.

### A. There is no set of undisputed facts showing that defendants are not liable for falsely arresting plaintiff.

"The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim.  For either type of claim, '[t]he focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff.'"  *Scott v. District of Columbia*, 101 F.3d 748, 753-54 (D.C. Cir. 1996) (quoting *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977)).

Plaintiff demonstrated above that there are no undisputed facts showing that defendants had probable cause to arrest him.  That demonstration applies equally here.

Defendants point out that under District of Columbia law, a claim of false arrest can also be defeated "'if the officer can demonstrate that he had a good faith belief that his conduct was lawful and that such belief was reasonable.'"  MSJ at 17 (quoting *Weishapl v. Sowers*, 771 A.2d 1014, 1020-21 (D.C. 2001)).  There may be some cases where the existence of probable cause *vel non* is such a close question that an arresting officer who did not have probable cause nevertheless could have "believed, reasonably and in good faith, that probable cause existed."  *Minch v. District of Columbia,* 952 A.2d 929, 937 (D.C. 2008).  But this is not such a case — at least not on any undisputed evidence in the record.

Accepting plaintiff's testimony that he was standing on the escalator with room for another person to pass on his left, Officer Tubbs could not reasonably have believed

18

that he had probable cause to arrest plaintiff for impeding the escalator.  And given the absence of any evidence that before plaintiff's arrest Officer Tubbs communicated to any other officer any facts about an alleged escalator infraction, no other officer reasonably could have believed that he had probable cause to arrest plaintiff for that offense.

Likewise, defendants' own testimony about what happened on the subway mezzanine prior to plaintiff's arrest is inconsistent with any reasonable, good faith belief that there was probable cause to arrest plaintiff for disorderly conduct.  It is not a close question whether exchanging angry words with a police officer is a crime.  It is not.  It is not a close question whether a few people "rubbernecking" as they walked to their trains constitutes "circumstances such that a breach of the peace may be occasioned."  It does not.

Accordingly, defendants' motion for summary judgment on the false arrest claim should be denied.

### B.   There is no set of undisputed facts showing that defendants are not liable for assault and battery.

"A battery is any unconsented touching of another person. Since an assault is simply an attempted battery, every completed battery necessarily includes an assault." *Mahaise v. United States*, 722 A.2d 29, 30 (D.C. 1998).

Defendants do not claim that they used no force against plaintiff, or that their use of force against plaintiff was consensual.  To prevail on their motion, defendants must therefore prove some affirmative defense — like the privilege provided by probable cause — using undisputed evidence.  That is indeed defendants' argument, *see* MSJ at 20 ("there was probable cause for the arrest of Plaintiff, entitling Defendants to use all force necessary to effectuate the arrest.").

As demonstrated above, however, defendants cannot show by undisputed evidence that they had probable cause to arrest plaintiff, or that they had any other

justification to use force against him.  *See supra* at 5-12; 14-16.  It follows that their motion for summary judgment on plaintiff's assault and battery claim should be denied.

Defendants also argue that plaintiff's failure to identify an expert witness on "police practices" precludes his ability to prove his assault and battery claim.  MSJ at 20. But no expert testimony is needed to tell the jury that no use of force is justified where there is no probable cause for arrest and no threatening behavior by plaintiff; that is a proposition of law on which the court can instruct the jury.  *See* cases cited *supra* at 15. The two cases cited by defendants are not to the contrary, as both involved claims of negligence in matters beyond the knowledge of ordinary jurors.  *See Tillman v. WMATA*, 695 A.2d 94, 97 (D.C. 1997) ("We do not believe that jurors are so familiar with the appropriate level of tightness of handcuffs and with the appropriate response of police officers to complaints by arrested individuals concerning the tightness of handcuffs, that the jury here reasonably could find for the plaintiff in the absence of expert testimony or of similar evidence establishing the standard of care."); *Etheredge v. District of Columbia*, 635 A.2d 908, 917 (D.C. 1993) (the "applicable standard of care" regarding a claim of negligent hiring, training, and supervision of police officers "is 'beyond the ken' of the average lay juror . . . .").

### IV.  Defendant Brown is not entitled to summary judgment.

Defendant Brown additionally moves for summary judgment on all claims, relying only on his own testimony that he was not involved in the arrest or assault of plaintiff.  MSJ at 20-21.  He may be telling the truth, and a factfinder may ultimately believe his testimony, but his story is not undisputed.

Officer Tubbs testified, "I don't even remember who all was there.  I know Santiago was one of them that was there, *and Brown.  Those officers actually dealt with Mr. Cardenas . . . .*"  Tubbs Dep. at 28 (emphasis added).  Officer Charneco recalled that Officers Santiago, Brown, Tubbs and himself were on the mezzanine.  Charneco Dep. at

10.  Officer Santiago recalled that there were five officers on the mezzanine.  Santiago Dep. at 24.  Ms. Avellaneda testified that when she heard plaintiff go down to the floor, there were "a whole bunch of officers on top of him. . . .  If I had to estimate, six, seven." Avellaneda Dep. at 27.  If there were only four or five officers on the mezzanine, and "a whole bunch of officers" piled on top of plaintiff, but not including Officer Tubbs (who testified that he was not involved), then crediting Officer Brown's testimony that he also was not involved requires discrediting Ms. Avellaneda's testimony that there were more than two or three officers on top of plaintiff.

Perhaps Ms. Avellaneda's recollection is inaccurate, and there were actually only two or three officers in the pile on top of plaintiff.  But on defendants' motion for summary judgment her testimony cannot be disbelieved, and Officer Brown's motion therefore cannot be granted.  *See, e.g., Carr v. District of Columbia*, 587 F.3d 401, 407-409 (D.C. Cir. 2009) (reversing grant of summary judgment for civil rights plaintiffs on the ground that the court was required to credit the affidavit of a police officer, no matter how implausible his story).

### V.  Defendant Charneco's motion for summary judgment on the common-law claims is moot.

Defendant Charneco moved for summary judgment on plaintiff's common-law claims on the ground that he was not identified and named in the amended complaint until nearly a year after the one-year statute of limitations had run on the common-law claims.  MSJ at 21.

Plaintiff has now voluntarily dismissed his common-law claims against defendant Charneco.  *See* Stipulation of Voluntary Dismissal as to Common-Law Claims Against Defendant Charneco, filed March 4, 2013, ECF No. 25.  This portion of defendants' motion for summary judgment should therefore be denied as moot.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be denied.

As specified in the Court's Minute Order of December 14, 2012, the parties should be given 45 days to complete any additional discovery they may wish to take. The parties should be directed thereafter to file a joint status report including a recommendation for further proceedings.

A proposed order incorporating such provisions is attached.

Respectfully submitted,

/s/   *Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar No. 455377)
Thomas L. Whiston[*]
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Ave., N.W., Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 457-0805
artspitzer@aclu-nca.org
fmulhauser@aol.com

*Counsel for plaintiff*

March 4, 2013

---

[*] Admitted in Maryland, practicing under supervision pending admission to the D.C. Bar.